**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LESLIE LARAY CRAWFORD,
　　　　　*Plaintiff-Appellant*,

v.

CITY OF BAKERSFIELD, a municipal entity, and AARON STRINGER, Officer,
　　　　　*Defendants-Appellees.*

No. 16-17138

D.C. No.
1:14-cv-01735-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Stanley Albert Boone, Magistrate Judge, Presiding

Argued and Submitted February 6, 2019
San Francisco, California

Filed December 16, 2019

Before: Sidney R. Thomas, Chief Judge, Richard A. Paez, Circuit Judge, and Gary Feinerman,[*] District Judge.

Opinion by Judge Feinerman

---

　　[*] The Honorable Gary Feinerman, United States District Judge for the Northern District of Illinois, sitting by designation.

## SUMMARY**

### Civil Rights

The panel vacated the district court's judgment in favor of defendants following a jury trial in an action brought pursuant to 42 U.S.C. § 1983 and state law arising from a police officer's fatal shooting of plaintiff's son, Michael Dozer.

Plaintiff alleged that the district court abused its discretion in excluding as irrelevant her testimony about her percipient observations of Dozer's past behavior, which she offered to prove that police officer Stringer should have recognized that Dozer was exhibiting signs of mental illness at the time of their encounter and therefore that the shooting was unreasonable.

The panel held that the district court abused its discretion in holding that plaintiff's proposed testimony was irrelevant because Stringer, at the time of the shooting, did not know about the past events to which plaintiff would have testified. The panel noted that whether a suspect has exhibited signs of mental illness is one of the factors a court will consider in assessing the reasonableness of the force used. The panel held that plaintiff's testimony regarding Dozer's past behavior and treatment was relevant to whether he would have appeared to be mentally ill on the day of the shooting, and therefore whether Stringer knew or should have known that Dozer was mentally ill.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected defendants' argument that plaintiff's testimony was an improper lay opinion under Rule 701 because she lacked the expertise to offer a psychological or psychiatric diagnosis. The panel held that so long as plaintiff stopped short of opining that Dozer had a mental illness, she was competent to testify about her own observations of and experiences with her Dozer.

The panel held that the district court's error in excluding plaintiff's testimony undercut her ability to prove a "central component" of her case: that a reasonable officer in defendant's position would have recognized that Dozer was mentally ill. The panel concluded that the evidentiary error was not harmless, and that a new trial was warranted.

**COUNSEL**

Emily T. Kuwahara (argued), Daniel P. Wierzba, Joel Mallord, and Alice Hall-Partyka, Crowell & Moring LLP, Los Angeles, California, for Plaintiff-Appellant.

Michael G. Marderosian (argued) and Heather S. Cohen, Marderosian & Cohen, Fresno, California, for Defendants-Appellees.

## OPINION

FEINERMAN, District Judge:

Leslie Crawford sued the City of Bakersfield, California and Bakersfield police officer Aaron Stringer (together, "Defendants"), bringing 42 U.S.C. § 1983 and state law claims arising from Stringer's fatal shooting of Crawford's son, Michael Dozer. After a three-day trial, the jury returned a special verdict finding that Stringer did not use excessive force or act negligently, and the district court entered judgment for Defendants. Crawford appeals, contending that the district court abused its discretion in excluding as irrelevant her testimony about her percipient observations of Dozer's past behavior, which she offered to prove that Stringer should have recognized that Dozer was exhibiting signs of mental illness at the time of their encounter and therefore that the shooting was unreasonable. We vacate the judgment and remand for a new trial.

## Background

Stringer, an on-duty police officer with the Bakersfield Police Department, shot and killed Dozer at a gas station while responding to calls reporting that Dozer "had poured gasoline on a woman and tried to light her on fire." Crawford brought this suit on her own behalf and as Dozer's successor in interest, alleging Fourth Amendment excessive force claims under § 1983 and state law wrongful death claims.

### A.  The Shooting

At around 12:30 p.m. on August 6, 2014, Elsa Torres was filling up her tank at a gas station. Dozer approached Torres's vehicle and removed the gas nozzle from the tank,

spraying some gas on her in the process.  Dozer then sprayed gas onto the ground around himself and set it on fire, creating a flame that Torres said went "maybe up to his knees." Dozer also took off some of his clothes.  Torres drove away, called 911, and told the operator that there was a man "trying to burn us."  While Torres was waiting for the police to arrive, she saw Dozer go over to the area outside a nearby minimart and start "knocking all the stuff down, like the newspaper stands and stuff."

Stringer was on patrol alone when he received a call through dispatch that "a subject at the gas station . . . had poured gasoline on a woman and tried to light her on fire" and that the woman's children were in her car.  While Stringer was on his way to the gas station, he received a second call indicating that a woman "had been lit on fire and that she put it out and left the scene."  It took Stringer "[m]aybe a couple of minutes" to get to the gas station.

When Stringer arrived, he spoke with Torres, who by that point was standing about fifty feet from Dozer.  Stringer did not observe on Torres any signs of burns, bruising, or other physical injury, nor did Torres say that she had been burned.  Stringer spoke with another witness, who said that Dozer had poured gasoline on Torres but who did not report that anyone had been injured.

Stringer testified that by the time Torres identified Dozer, Dozer had moved away from the gas pumps and toward the minimart.  The closest people to Dozer were twenty feet away.  As far as Stringer could see, Dozer did not have any gasoline or incendiary liquids and was not assaulting anyone, but instead was merely "pacing around" the area, looking "very agitated."  Stringer thought that Dozer's behavior was "erratic" and "aggressive in general," but not aggressive toward Stringer in particular.  Another

person at the scene, Rosalie Montiel, testified that Dozer was "walking back and forth" and "looked unapproachable," but that she did not see him threatening anyone. Carlos Cabrera, who was also at the scene, testified that Dozer was shouting, hitting a table with his hands, standing up, and sitting back down repeatedly—"kind of going around in circles." Cabrera also recounted that Dozer was staring at people and saying "odd things."

When Stringer approached Dozer, he did not think Dozer was actively committing any crime while pacing around the area near the minimart. Stringer did, however, consider "the crime of assault with a caustic chemical" against Torres to still be "in progress" because it "had just occurred seconds . . . or minutes" before. Stringer testified that he had not drawn a weapon at that point and had no intention of using force, and that he merely wanted to talk to Dozer. Without waiting for backup, Stringer moved closer so that he could hear what Dozer was saying.

According to Stringer, Dozer said, "You want to do this. Let's go." Stringer responded, "No, let's not do this. I just want to talk to you." Dozer's words, along with his pacing and his "amped up" and "angry" demeanor, made Stringer think that Dozer "was challenging [him] and had intended to challenge [him] despite [his] clear uniform" identifying him as a police officer. Stringer testified that he concluded that Dozer was "under the influence of a narcotic and was visibly agitated" and that the situation would "most likely . . . escalate quickly," leading him to call for expedited backup. By that time, however, Stringer felt that he "didn't have the chance" to wait for backup, even though he knew from radio transmissions that it was on the way.

Stringer stopped about twenty feet away from Dozer and told him to get on the ground. Stringer testified that Dozer

then began moving toward him "very quickly," picked up a horseshoe-shaped bike lock, raised it over his head, ignored an order to put it down, and started "charg[ing]" toward him "quicker than [he] could back up."

Stringer testified that he started backing up and drew his handgun. Stringer was also carrying three nonlethal weapons: a Taser that could fire darts at a range of up to twenty-six feet, pepper spray, and a collapsible baton. Stringer claimed that those alternatives were not viable because they would take too long to deploy, as Dozer was approaching him "with a deadly weapon," the bike lock.

Ultimately, less than a minute after arriving on the scene, Stringer shot Dozer. The first backup officer to arrive, George Vasquez, was pulling up in his car when he saw the shooting. Vasquez did not see Stringer backpedaling at any point. He did, however, see Dozer moving toward Stringer, and he believed based on Dozer's "facial demeanor" and "rapid movement," as well as the fact that Dozer was holding the bike lock "over his head," that Dozer intended to harm Stringer. Vasquez testified that Dozer and Stringer were about five to ten feet apart at the time of the shooting.

The other eyewitnesses—Cabrera, Montiel, and Torres—gave varying accounts of the lead-up to the shooting, including testimony that conflicted with each other's and the officers' accounts as to whether and how quickly Dozer was moving toward Stringer; whether Dozer was holding the bike lock at his side, holding it in his raised hand, or swinging it at Stringer; how close Dozer got to Stringer; and whether Stringer stayed put or backed away as Dozer approached.

## B.  Stringer's Training

As part of his training, Stringer received a Police Officer Standards and Training ("POST") certification.  POST teaches officers how to recognize symptoms of mental illness and respond to people demonstrating those symptoms without escalating the situation.  As a requirement of POST, Stringer was taught that erratic and irrational behavior and attempted self-harm were indicators of mental illness.  He was trained that when responding to a situation involving a person who appeared to be mentally ill, he should slow down, wait for backup, and consider ways of subduing the person using minimal force.  He was also trained to minimize the person's anxiety by speaking slowly, moving slowly, and turning down his radio.

## C.  Police Practices Experts

At trial, the parties presented testimony from dueling police practices experts.  Crawford's expert, Scott DeFoe, opined that Dozer's "bizarre" behavior—approaching Torres, pouring gasoline on himself, lighting himself on fire, and then going over to the minimart and acting strangely—would have led a reasonable officer to believe that Dozer was "either mentally ill or experiencing a mental crisis." DeFoe did, however, acknowledge that Dozer's spraying gasoline on Torres and himself also could have been consistent with his being under the influence of drugs. DeFoe explained that while "officers are not going to diagnose someone in the field," they are taught to recognize "what mental illness looks like."  DeFoe said that the objective when dealing with a person who may be suffering from mental illness is to "calm them down" and "just get them handcuffed, with the least amount of force possible."

Given this understanding of reasonable police practices, DeFoe concluded that Stringer did "the opposite" of what he should have done: "Instead of waiting for backup, instead of considering less than lethal options, [Stringer] immediately just almost at a rapid pace walked towards" Dozer. While recognizing that it was "prudent" of Stringer to request expedited backup, DeFoe faulted Stringer for failing to wait for backup even though "time [was] on [his] side" in light of the absence of continuing criminal activity. DeFoe opined that Dozer posed no immediate threat because he was "over there by himself," with "no one else next to him," thus "mak[ing] it even more compelling that you need to get a backup and get people before taking any action."

Defendants' expert, Curtis Cope, disagreed. In Cope's view, Dozer continued to pose "an immediate threat to the citizens" when Stringer arrived on the scene, and Dozer then confronted Stringer with the imminent threat of deadly force. Cope acknowledged that officers are trained to recognize signs of mental illness and respond accordingly, including by calling for backup and moving slowly when circumstances permit. Cope opined, however, that an officer in Stringer's shoes could not have been expected to "think . . . immediately" that someone who "took a nozzle out of [a victim's] gas tank, might have gotten some gasoline on her, put gasoline on himself, [and] started a fire right there at the station" was mentally ill. Accordingly, Cope concluded that Stringer had complied with all applicable standards and was "right in doing what he did."

### D. Crawford's Deposition Testimony Regarding Dozer's Past Behavior and Treatment

At her pretrial deposition, Crawford testified that Dozer suffered from schizophrenia. Dozer often talked to himself, and once asked Crawford, "[W]hy do these voices keep

messing with me?" After dropping out of high school during his senior year, Dozer lived with Crawford and her husband intermittently, typically staying for three to six months and then leaving. At other times, Dozer stayed with his sisters or "would just be like in the streets, wandering, talking to his-self."

Crawford recalled that Dozer had received counseling and various medications from a healthcare provider called Turning Point. The medications tended to work well for a time—perhaps a month—but then would stop working. In addition to taking him to Turning Point, Crawford and one of Dozer's sisters took him on multiple occasions to the Mary K. Shell Mental Health Center, which Crawford understood to be a "crisis center." Crawford knew that Dozer also went "a few times" to "3-B," meaning the Kern Medical Psychiatric Inpatient Unit in Bakersfield.

As far as Crawford was aware, Dozer's only drug use was smoking marijuana "for a little while." Dozer told Crawford that, at first, "the weed helped him with the voices that he heard," but it eventually stopped helping, so he stopped using it.

### E. The District Court's Order Excluding Crawford's Testimony About Dozer's Past Behavior and Treatment

Defendants moved *in limine* to exclude "any reference that [Dozer] was schizophrenic or suffered from any mental illness," arguing (as relevant here) that the evidence was irrelevant and an improper lay opinion. Crawford responded that evidence that Dozer's behavior on the day of the shooting was consistent with the signs of mental illness that Stringer was trained to recognize was relevant to the critical question whether Stringer's use of force was reasonable.

The district court granted Defendants' motion. *Crawford v. City of Bakersfield*, 2016 WL 6038954 (E.D. Cal. Oct. 14, 2016).  The court rejected Defendants' argument that *any* evidence of mental illness was necessarily irrelevant, reasoning that whether Dozer's behavior "was due to being under the influence of a drug such as PCP" or to mental illness "is relevant to determining whether the force used in this instance was reasonable."  But the court barred Crawford from testifying about her observations of Dozer's past behavior, reasoning that because Stringer had no prior knowledge of Dozer, Crawford's observations were "not relevant to the issue of whether [Stringer] should have known that [Dozer's] behavior [leading up to the shooting] could have been caused by mental illness."

## F.  Jury Instructions and Closing Arguments

The court instructed the jury that, when determining whether Stringer used excessive force, it should "consider all of the circumstances known to Officer Stringer on the scene, including . . . whether it should have been apparent to Officer Stringer that the person he used force against was emotionally disturbed."  During closing arguments, Crawford's counsel contended that the evidence "amply supported" a finding that Stringer should have known that Dozer was emotionally disturbed.  Counsel directed the jury's attention to the evidence that Stringer was trained to recognize signs of mental illness and respond accordingly, as well as to the eyewitness accounts, which suggested that it was apparent even without training that there was "something wrong with Mr. Dozer."

In their closing argument, Defendants seized on the lack of evidence that Dozer was mentally ill—a lack of evidence resulting from the district court's exclusion of Crawford's

testimony regarding her observations of Dozer's past behavior:

> In this court of law, the Plaintiffs have the burden of proof. They have to prove the case. Have you heard any evidence from any psychologist, psychiatrist, anyone that said Mr. Dozer had any mental illness at all? You haven't heard any evidence on that. That's just [Plaintiff's counsel's] speculation. He wants you to accept that Mr. Dozer was mentally ill and that somehow means that he's to be treated differently. There's been no evidence that he was mentally ill, no evidence at all.

> In fact, what [Plaintiff's counsel] wants you to believe, well, his conduct demonstrated that Officer Stringer should have known that he was mentally ill. That conduct, as you heard in the evidence, is consistent with drug use as well, PCP use. . . .

> . . . .

> And, again, on this issue of mental illness, no evidence of that at all. Zero. If this really was a case about how we treated or responded to a mentally ill person, you would have seen a medical doctor, a psychiatrist, a psychologist come in and tell you that they've either diagnosed Mr. Dozer or that there was evidence of that. You're being asked to speculate on that, and . . . when you're asked to speculate, the Plaintiffs aren't

carrying their burden by proving their case by a preponderance of the evidence.

The jury returned a special verdict finding that Crawford failed to prove that Stringer used excessive force or was negligent, and the district court entered judgment for Defendants. Crawford timely appealed.

## Discussion

We have jurisdiction under 28 U.S.C. § 1291. Contrary to Defendants' suggestion that Crawford's notice of appeal is deficient because it identifies only the judgment and not the order granting Defendants' motion *in limine*, the *in limine* order merges with the judgment and thus is properly before us. *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1070 (9th Cir. 2012).

"Evidentiary rulings are reviewed for abuse of discretion." *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014). The district court's application of the correct legal standard is an abuse of discretion if it is "illogical," "implausible," or "without support in inferences that may be drawn from the facts in the record." *United States v. Espinoza*, 880 F.3d 506, 511 (9th Cir. 2018) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). In the civil context, an error will support reversal only if it "more probably than not tainted the verdict." *Wilkerson*, 772 F.3d at 838 (internal quotation marks omitted) (quoting *Engquist v. Or. Dep't of Argric.*, 478 F.3d 985, 1009 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008)).

## I.  Relevance of Crawford's Proposed Testimony

Evidence Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable

than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence Rule 402 provides that relevant evidence is admissible unless another rule or federal law provides otherwise, and that irrelevant evidence is inadmissible. Fed. R. Evid. 402. Rule 401's "basic standard of relevance . . . is a liberal one." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993); *see also United States v. Whitehead*, 200 F.3d 634, 640 (9th Cir. 2000) (citing Rule 401 for the proposition that relevance is a "minimal requirement"); *United States v. Curtis*, 568 F.2d 643, 645 (9th Cir. 1978) ("Rule 401 . . . contains a very expansive definition of relevant evidence.").

Deciding whether a fact is "of consequence in determining the action" generally requires considering the substantive issues the case presents. *See* Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case."). Here, Crawford alleged that Stringer used excessive force in violation of the Fourth Amendment and that his actions were negligent under California law.

In evaluating a Fourth Amendment excessive force claim, the jury asks "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017) (alteration omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). That analysis requires balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1030

(9th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 1031 (quoting *Graham*, 490 U.S. at 396). The "three primary factors" in assessing the government's interest are (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id*. (alteration and internal quotation marks omitted). These factors are not exclusive. *Id*. at 1033.

Crawford's wrongful death claim turned on similar considerations. To prevail on her negligence theory, Crawford had to show that Stringer "had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 305 P.3d 252, 255 (Cal. 2013) (quoting *Nally v. Grace Cmty. Church of the Valley*, 763 P.2d 948, 956 (Cal. 1988)). Under California law, "peace officers have a duty to act reasonably when using deadly force." *Id*. at 256. "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id*. California's totality-of-the-circumstances inquiry includes pre-shooting circumstances and thus "is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id*. at 263; *accord Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016) ("[N]egligence claims under California law encompass a broader spectrum of conduct than excessive force claims under the Fourth Amendment.").

The district court correctly held that evidence of Dozer's mental illness was relevant because the reasonableness of

Stringer's use of deadly force depended in part on whether he knew or should have known that Dozer's behavior was caused by mental illness. Although we have "'refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals,' our precedent establishes that if officers believe a suspect is mentally ill, they 'should make a greater effort to take control of the situation through less intrusive means.'" *Vos*, 892 F.3d at 1034 n.9 (alterations omitted) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)). Accordingly, "whether the suspect has exhibited signs of mental illness is one of the factors the court will consider in assessing the reasonableness of the force used, in addition to the *Graham* factors, the availability of less intrusive force, and whether proper warnings were given." *Id.*; *see also Glenn v. Washington Cty.*, 673 F.3d 864, 875 (9th Cir. 2011) ("Another circumstance relevant to our analysis is whether the officers were or should have been aware that [the individual] was emotionally disturbed."); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("Even when an emotionally disturbed individual is 'acting out' . . . , the governmental interest in using [deadly] force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.").

The district court abused its discretion, however, in holding that Crawford's proposed testimony was irrelevant on the ground that Stringer, at the time of the shooting, did not know about the past events to which Crawford would have testified. Crawford's testimony regarding Dozer's past behavior and treatment was relevant to whether he was in fact mentally ill at the time. Evidence that Dozer had *previously* behaved in ways consistent with mental illness and had been taken to mental health providers for treatment,

makes it more likely that he *continued* to suffer from mental illness on the day of the shooting.  In turn, whether Dozer was *in fact* mentally ill that day is relevant to whether he would have *appeared* to be mentally ill, and thus to whether Stringer knew or should have known that Dozer was mentally ill; after all, the existence of some underlying fact tends to make it more likely that a person knew or should have known that fact. *See United States v. James*, 169 F.3d 1210, 1214–15 (9th Cir. 1999) (en banc) (holding that documents corroborating the stories that the defendant claimed the decedent told her about the decedent's past acts of violence were relevant to her self-defense argument even though she had never seen the documents, reasoning that the truth of the decedent's stories made it more likely (1) that he had told them and (2) that the stories "had the ring of truth" to the defendant).  Thus, Crawford's testimony about Dozer's past behaviors and treatment was relevant even though Stringer had no knowledge of them. *See Boyd v. City & Cty. of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009) ("[W]here what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible."); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 400 (7th Cir. 2012) (explaining that "evidence unknown to officers at the time force was used" may be relevant in evaluating credibility, such as by making it more or less likely that "a suspect acted in the manner described by the officer").

Accordingly, the district court abused its discretion in excluding Crawford's proposed testimony under Rules 401 and 402.

## II. Alternate Ground for Excluding Crawford's Proposed Testimony

On appeal, Defendants contend that Crawford's testimony was an improper lay opinion under Rule 701 because she lacked the expertise to offer a psychological or psychiatric diagnosis. That argument misses the point. As Crawford notes, she was "not attempting to testify that her son was diagnosed with schizophrenia." And as the district court correctly held, Crawford was competent to testify as a lay witness "regarding her observations of" Dozer's past behavior. Thus, so long as Crawford stopped short of opining that Dozer had a mental illness, she was competent to testify about her own observations of and experiences with Dozer. *See Frisone v. United States*, 270 F.2d 401, 403 (9th Cir. 1959) (distinguishing between a witness's admissible lay testimony "as to his faulty recollection and poor memory" and inadmissible "testimony as to the existence or treatment of a mental illness serious enough to cause permanent memory impairment," and noting that "only expert testimony will be allowed on technical questions of causation").

## III.    Prejudicial Error

Defendants contend that any error in excluding Crawford's testimony was harmless. In a civil case, an evidentiary error is prejudicial if it "more probably than not tainted the verdict." *Wilkerson*, 772 F.3d at 838 (quoting *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1009 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008)). Here, the district court's error undercut Crawford's ability to prove a "central component" of her case: that a reasonable officer in Stringer's position would have recognized that Dozer was mentally ill. *See id*. at 841. The importance of the excluded

testimony makes "the likelihood of prejudice . . . difficult to overcome." *Id.*

As noted, the district court instructed the jury to consider "whether it should have been apparent to Officer Stringer that the person he used force against was emotionally disturbed." Granted, that factor appeared in a list of nine nonexclusive factors for determining whether Stringer's use of force was reasonable. But given the facts and circumstances of this case, we have little doubt that it played an important role in the jury's verdict.

Excluding Crawford's testimony was prejudicial in at least three ways. First, evidence suggesting that Dozer was *in fact* mentally ill "could have provided the missing link to establish" that a reasonable officer in Stringer's position would have *realized* that Dozer was mentally ill. *Espinoza*, 880 F.3d at 519. Without that link, Crawford had to ask the jury to find that Stringer should have known something she was unable to prove directly.

Second, DeFoe's opinion that Stringer should have recognized Dozer's mental illness almost certainly would have carried more weight had Crawford been able to present evidence indicating that Dozer was in fact mentally ill. That is particularly so given DeFoe's acknowledgement that at least some of Dozer's behavior could also have been consistent with his being under the influence of drugs—a theory that Defendants seized on in their closing argument. Crawford's testimony would have bolstered DeFoe's opinion by making it more likely that Dozer's behavior was in fact a result of mental illness and thus more likely that his behavior would have been viewed as such by a reasonable officer at the scene. *See Geurin v. Winston Indus., Inc.*, 316 F.3d 879, 885 (9th Cir. 2002) (holding that the district court's erroneous exclusion from a products liability trial of

evidence that the product was improperly maintained by non-parties "tainted the verdict" in that it prevented the defendant "from providing the jury with an alternative explanation," thus "preordain[ing]" the jury's verdict that a design defect was the accident's sole proximate cause).

Third, Crawford's testimony would have deprived Defendants of a powerful component of their closing argument—their submission that Crawford's mental illness theory had "[z]ero" evidentiary support.   Granted, Defendants could still have suggested in closing that if Dozer had truly been mentally ill, "you would have seen a medical doctor, a psychiatrist, a psychologist come in and tell you that they've either diagnosed Mr. Dozer or that there was evidence of that."  But Defendants would not have been able to argue that "[t]here's been no evidence that he was mentally ill, no evidence at all."   "[A]s this court has recognized, 'closing argument matters a great deal.'"  *United States v. Bailey*, 696 F.3d 794, 805 (9th Cir. 2012) (alteration omitted) (quoting *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993)).  Defendants' emphasis in their closing on the lack of evidence that Dozer was in fact mentally ill reinforces its centrality to Crawford's case.

Defendants' argument that the error was harmless is without merit.  Reversing course from what they told the jury in their closing, Defendants submit that there was *so much* evidence of mental illness—the testimony about Stringer's training to recognize mental illness, DeFoe's opinion that a reasonable officer would have concluded that Dozer was mentally ill, and the eyewitness testimony that Dozer appeared disturbed—that Crawford's excluded testimony was unlikely to have made a difference to the verdict.  But as discussed above, the evidence that Crawford was allowed to present carried far less weight than it would have had she

been able to provide testimony indicating that Dozer was in fact mentally ill.

The case cited by Defendants to support their harmless error argument, *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 953 (9th Cir. 2018), is distinguishable. In *Smith*, we held that an improper reference during closing argument to a "tub of additional substances" supposedly found on the plaintiff's property was "unlikely to have swayed the jury"—which had, after all, heard witnesses characterize the property as a drug warehouse—and was therefore harmless. *Id*. Here, by contrast, Crawford does not contend that Defendants' closing argument was improper; rather, she contends that Defendants' emphasis on the absence of the erroneously excluded evidence in their closing demonstrates the importance of that evidence.

Finally, Defendants make a strawman argument, suggesting that Crawford "would like this Court to take the position that any use of deadly force against an individual who is mentally ill is always unreasonable or unlawful." That is not what Crawford argues, nor do we adopt that position simply by protecting her ability to offer relevant evidence to prove an important but not dispositive factor in the excessive force analysis.

Accordingly, the district court's evidentiary error was not harmless, and a new trial is warranted. The parties shall bear their own costs.

**VACATED and REMANDED.**