**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN A. HYER, Individually and as Personal Representative of The Estate of Steven K. Hyer,

*Plaintiff-Appellant*,

and

THERESA L. CHANG; CASSI H. HYER,

*Plaintiffs*,

v.

CITY AND COUNTY OF HONOLULU; PAUL V. NOBRIGA, in his individual capacity; WAYNE SILVA, in his individual capacity; MALO B. TORRES, in his individual capacity,

*Defendants-Appellees*,

and

JOHN DOES, 4-10; JANE DOES, 1-10; DOE CORPORATIONS, 1-10;

No.23-15335

D.C. No.
1:19-cv-00586-HG-RT

OPINION

DOE PARTNERSHIPS, 1-10; DOE
UNINCORPORATED
ORGANIZATIONS, 1-10,

*Defendants*.

Appeal from the United States District Court
for the District of Hawaii
Helen W. Gillmor, District Judge, Presiding

Argued and Submitted February 14, 2024
University of Hawaii Manoa

Filed September 23, 2024

Before:  Richard A. Paez, Milan D. Smith, Jr., and Lucy H.
Koh, Circuit Judges.

Opinion by Judge Paez

# SUMMARY[*]

## Expert Testimony / Qualified Immunity

The panel reversed in part and affirmed in part the district court's summary judgment in favor of defendants, the City and County of Honolulu and several officers of the Hawai'i Police Department ("HPD"), in plaintiffs' action alleging claims of excessive force in violation of the Fourth Amendment, violations of Title II of the Americans with Disabilities Act ("ADA"), and various state law claims arising out of an encounter between HPD and Steven Hyer that resulted in Hyer's death.

The panel held that the district court's decision to exclude the entirety of plaintiffs' expert reports was erroneous because (1) to the extent the district court suggested that experts can rely only on evidence in the record, that was a misstatement of law; (2) the district court misapprehended the relevant legal standard and mischaracterized the content of the reports; (3) the district court erred in ruling that the expert reports were speculative and unreliable; and (4) the district court's conclusory statement that the expert reports attempted to introduce legal conclusions that would usurp the role of the court in instructing the jury did not support exclusion of all three reports in their entirety. The panel did not hold that all three reports should be admitted in their entirety, and rather concluded simply that the district court abused its discretion by excluding all the expert reports in their entirety.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court's decision to exclude the entirety of plaintiffs' expert reports was also prejudicial because (1) the expert reports help create genuine disputes of material fact over whether the use of deadly force against Hyer was objectively reasonable; (2) the expert reports help create genuine disputes of material fact as to whether the use of chemical munitions was objectively reasonable; (3) the expert reports raise genuine disputes of material fact as to whether the City and County of Honolulu violated Hyer's rights under the ADA, except that the district court properly granted summary judgment to defendants on plaintiffs' ADA disparate treatment claim; and (4) with respect to plaintiffs' state law claims, the expert reports aid in establishing genuine disputes of material fact as to whether defendants are entitled to conditional privilege under state law.

Addressing the district court's grant of qualified immunity to the defendant officers with respect to plaintiffs' excessive force claims, the panel held that the district court erred in granting qualified immunity with respect to the use of deadly force and chemical munitions because (1) viewing the evidence in the light most favorable to plaintiffs, the use of deadly force and chemical munitions was not objectively reasonable, and (2) the law was clearly established. The panel affirmed the district court's grant of qualified immunity with respect to the use of a police dog because the law was not clearly established.

## COUNSEL

Mateo Caballero (argued), Caballero Law LLLC, Honolulu, Hawaii, for Plaintiff-Appellant.

William R.K. Awong (argued), Paul S. Aoki, and Nicolette Winter, Deputies Corporation Counsel, Department of the Corporation Counsel, City and County of Honolulu, Honolulu, Hawai'i, for Defendants-Appellees.

## OPINION

PAEZ, Circuit Judge:

Plaintiffs-Appellants Steven A. Hyer, Theresa S. Chang, and Cassi H. Hyer (collectively, "Plaintiffs") sued the City and County of Honolulu as well as several officers of the Hawai'i Police Department ("HPD") (collectively, "Defendants"), bringing federal and state law claims arising out of an encounter between HPD and Steven K. Hyer that resulted in Hyer's death.[1]  The district court both granted summary judgment in favor of Defendants on all claims and determined that the defendant officers were entitled to qualified immunity against Plaintiffs' constitutional claims. Plaintiffs appeal, arguing that the district court abused its discretion in excluding the entirety of the expert reports they submitted in opposition to Defendants' motion for summary judgment.  We reverse in part and affirm in part.

---

[1] We refer to Plaintiffs as a collective throughout this opinion, and we refer to Steven K. Hyer—the decedent—as "Hyer."

## I. Background

On June 22, 2018, Hyer was in his residence, a small studio apartment located on the ground floor at the rear of a multilevel shared house in Haleiwa, Hawai'i. Hyer's room contained a sliding glass door opening onto a deck, which was its only means of egress.

Around 5:30 PM, Hyer was involved in a confrontation with another tenant. An argument ensued, and Hyer became angry, ultimately breaking a window screen to gain entry to the tenant's living area. The other tenant called HPD. Two HPD officers responded to the call, reporting that Hyer was rambling about devil worshippers and bodies in the wall but left without arresting him.

Around 7:55 PM, another one of Hyer's co-tenants called HPD, reporting that Hyer had attempted to break into their bedroom. This time, four HPD officers responded to the call. They found Hyer more agitated than before, pacing back and forth in his room and speaking incoherently.

Around 8:45 PM, one of the officers—Officer Frances Bolibol—contacted a police psychologist to obtain approval for an "MH-1," an application for emergency examination and hospitalization. Haw. Rev. Stat. § 334-59. The psychologist approved the MH-1 based on Officer Bolibol's description of Hyer's behavior and directed that Hyer be taken into protective custody.

The responding officers, however, were unable to do so. After approaching Hyer and requesting he leave with them, Hyer refused and became confrontational. When officers ordered Hyer to open the gate to his deck, he obeyed. He then retreated into his room.

A few moments later, Hyer returned to the sliding glass door and started pounding it with a knife, telling the police to "go ahead just kill me."  Around 9:01 PM, Hyer again approached and slid open the door, holding a knife.  Officer Bolibol ordered Hyer to drop the knife.  When Hyer refused to comply, Officer Bolibol shot him with a Taser.  Hyer fell back but quickly got up and locked the sliding door.  Hyer was then seen yelling and babbling as he paced around the room.

Around 9:12 PM, Hyer called 911 and told the dispatcher that he had been shot with a Taser, that the officers were offending him, and that he wanted them to leave.  Around 9:15 PM, another officer—Lieutenant Darin Evangelista—activated the Specialized Services Division ("SSD").[2]

Around 9:30 PM, Lieutenant Evangelista informed Major Darren Chun, another arriving officer, that Hyer was suspected of having post-traumatic stress disorder,[3] appeared agitated, was suicidal, and was armed with a knife. Major Chun then activated the SWAT Team and made a "callout" for all available officers to come to the scene.

---

[2] According to HPD's website, the SSD is a division that "performs a number of diverse functions that require unique skills."  *Specialized Services*, Haw. Police Dep't, https://perma.cc/GJ7U-VM8J (last accessed Aug. 27, 2024).  For example, the SSD includes the SWAT Team, the Bomb Squad, and the Canine Unit.  *Id.*

[3] During his military service in the Air Force, Hyer sustained a traumatic brain injury.  He suffered from chronic headaches and was diagnosed with atypical psychosis, depressive disorder, anxiety disorder, and substance abuse disorder.

Major Chun also decided not to utilize the Crisis Negotiation Team ("CNT").[4]

Around 10:00 PM, Sergeant Paul Nobriga was designated to act as the leader of the react team, a tactical response SWAT team, to handle the developing situation and take Hyer into custody. A different officer was selected to act as the leader for the SSD perimeter team. The SSD perimeter team secured all other areas of the residence, evacuating all occupants, and ensuring the only entrance and exit to Hyer's room was through the sliding glass door.

Around 11:00 PM, Sergeant Nobriga arrived at the scene and was briefed that Hyer had barricaded himself in his room and had brandished knives and a compound bow at patrol officers.

Around 12:48 AM, Sergeant Nobriga started making announcements to Hyer and asking him to come outside. At some point following the announcements, Hyer moved a curtain so that he could be seen, "sticking [his] middle finger" out at the officers. Hyer also showed himself a second time but would not exit the residence.

Around 1:15 AM, officers breached Hyer's bathroom window to gain visual advantage and deny Hyer access to the room and water in the event chemical munitions were used. Hyer then closed the bathroom door and attempted to further barricade it.

Around 1:20 AM, Sergeant Nobriga issued an order to clear the trees that separated the house from the lane behind

---

[4] According to Plaintiffs' expert Scott A. DeFoe, "[a] Crisis Negotiation Team provides specialized support in handling critical field operations where intense negotiations and/or special tactical deployment methods beyond the capacity of field officers appear to be necessary."

it and position an armored vehicle in that opening with a sniper. Additional announcements were made using the vehicle's loudspeaker, but Sergeant Nobriga could not hear Hyer's responses.

Around 2:20 AM, Sergeant Nobriga ordered his team to shatter the sliding door and deploy chemical munitions into the bedroom. Officers ultimately fired nine rounds of chemical munitions.[5] Hyer became very agitated, but he did not surrender.

At some point after the chemical munitions were fired, Hyer showed himself again holding what the perimeter team thought was a crossbow but what others perceived as a stick. The perimeter team suggested that he was pointing the item at the officers, while other officers suggested he was using the item to clear off the remaining glass from the sliding door. One officer also conversed with Hyer, but Hyer would not surrender.

Around 2:50 AM, Major Chun and Sergeant Nobriga decided to send in a police dog to "control" Hyer outside the apartment once he showed himself again so that Hyer could not retreat back into the apartment and potentially arm himself. At that time, Corporal Wayne Silva announced: "This is the Police, give yourself up now or I'm sending in my dog and he will bite!" At some point after this announcement, Hyer came to the doorway, leaned outside

---

[5] Officers deployed eight "CS ferret barricade penetrating projectiles" and one "OC instantaneous blast hand deployed canister" into Hyer's residence. Plaintiffs argue "some of these rounds may have even hit Hyer." No warning appears to have been given before the munitions were deployed.

the broken sliding door, and began yelling. Corporal Silva, the police dog's handler, then deployed the dog.

A group of four SWAT react team members—Officers Otto and Nomura, and Corporals Torres and Silva—followed the dog into the room, where it was biting Hyer on his left arm. Hyer was hitting the dog with a compound bow, which was in his left hand, and stabbing the dog multiple times with an arrow, which was in his right hand. Corporal Silva told Hyer to stop fighting the dog. Corporal Torres then shot at Hyer three times, killing him.

In the aftermath of the shooting, Sergeant Nobriga interviewed Corporal Torres about the shooting. In his police report submitted later that day, Corporal Torres justified the shooting on the basis that Hyer "began to load the arrow into the bow and to pull the arrow to the rear, getting ready to fire the arrow, toward[] [Torres] and the other officers."

## II. Procedural History

In October 2019, Plaintiffs filed a complaint in the district court, alleging various constitutional, statutory, and common-law claims. After several motions to dismiss, Plaintiffs filed a Second Amended Complaint ("SAC") against Defendants.

In February 2021, Defendants filed a motion to partially dismiss the SAC. In May 2021, the district court granted in part and denied in part Defendants' motion. The following counts remained: (1) excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 against the defendant officers, (2) violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*,

against the City and County of Honolulu, and (3) various state law claims against all Defendants.

In April 2022, the defendant officers and the City and County of Honolulu each filed a motion for summary judgment. In support of their opposition memorandum, Plaintiffs filed an opposing statement of facts, to which they attached three expert declarations together with expert reports by (1) Dr. A. E. Daniel, M.D., a forensic psychiatrist opining on Hyer's disability and mental state at the time of the incident, (2) Scott A. DeFoe, a policing practices expert opining on the reasonableness of HPD's actions, and (3) Dr. Kris Sperry, M.D., a forensic pathologist opining on the gunshot wounds that killed Hyer. The defendant officers and the City and County of Honolulu each filed a reply.

The district court ultimately granted Defendants' motions for summary judgment. *Hyer v. City & Cnty. of Honolulu*, 654 F. Supp. 3d 1111, 1118–19 (D. Haw. 2023). The court first determined that Plaintiffs' expert reports were inadmissible because they inappropriately attempted to introduce facts not in the record, were speculative and unreliable, and attempted to introduce legal conclusions. *Id.* at 1119–20. The court then concluded that (1) all of the uses of force against Hyer were objectively reasonable and justified, (2) it was not clearly established that Defendants' uses of force were objectively unreasonable considering all the undisputed facts and the totality of the circumstances, (3) the ADA claim failed because Hyer posed a direct threat to the officers and the officers had probable cause to arrest Hyer, and (4) Defendants were entitled to qualified privilege against the state law claims. *Id.* at 1125–46.

The district court entered final judgment in favor of Defendants in February 2023. Plaintiffs timely appealed.

### III. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291.

A district court's evidentiary rulings are reviewed for abuse of discretion. *See Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023). A district court's order granting summary judgment is reviewed de novo. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011).

### IV. Discussion

"Rule 702 of the Federal Rules of Evidence tasks a district judge with 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The district court has "broad discretion" in rendering such evidentiary rulings. *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017) ("*Pomona II*") (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014)) ("*Pomona I*"). However, we may reverse "if the exercise of discretion is both erroneous and prejudicial." *Id.* In this case, we conclude that the district court's decision to exclude the entirety of Plaintiffs' expert reports was both erroneous and prejudicial.

### A. Error

"A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004). Here, the district court excluded all three of Plaintiffs' expert reports for three reasons: (1) the reports "attempt to introduce facts that are not found anywhere in the record," (2) the reports "are speculative and

unreliable," and (3) the reports "attempt to introduce legal conclusions that would usurp the role of the Court in instructing the jury as to the applicable law." *Hyer*, 654 F. Supp. 3d at 1120.  In so doing, the district court made "multiple 'manifestly erroneous' misstatements of law and fact in [its] order." *Reed v. Lieurance*, 863 F.3d 1196, 1208 (9th Cir. 2017) (citation omitted).  Thus, the court's wholesale exclusion of all three reports constitutes an abuse of discretion.[6]

## 1.

To begin, the district court erred in excluding the entirety of Plaintiffs' expert reports on the grounds that they "inappropriately attempt to introduce facts that are not found anywhere in the record" and that the experts "have no personal knowledge of the events that took place and *no basis* to provide testimony as to the facts here." *Hyer*, 654 F. Supp. 3d at 1120 (emphasis added).

---

[6] As an initial matter, the district court excluded all three expert reports with little to no explanation.  For example, only the court's second reason contained a specific reference to the reports, and even then only to one. *See Hyer*, 654 F. Supp. 3d at 1120.  Likewise, the court mentioned DeFoe's report only once with no analysis regarding its content, even though it was excluded in its entirety.  Although a district court is not required to expound at length on the reasons for its rulings on expert testimony, a failure to reasonably explain the rulings casts doubt on their propriety. *See United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) (determining that the district court abused its discretion where it excluded expert testimony and "never clearly articulated why it excluded this evidence"); *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (concluding that the district court abused its discretion where "[i]n two conclusory sentences and without analysis or explanation, the district court held that [a proposed witness] was not a qualified expert" and excluded the associated report).

First, to the extent the district court suggested that experts can rely only on evidence in the record, that was a misstatement of law.  Rule 703 permits an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed" as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703.  This includes knowledge and experiences that are not necessarily in the record.  *See Reed*, 863 F.3d at 1208.

Second, to the extent the district court suggested that, as Defendants argue, the experts' reports should be excluded because they "created their own facts," which they then relied upon to form their opinions, the court also erred.  This approach misapprehends the relevant legal standard and mischaracterizes the content of the reports.

Rule 702 requires that expert testimony be "based on sufficient facts or data."  Fed. R. Evid. 702.  "District courts [thus] have a longstanding responsibility to screen expert testimony, and to prevent unfounded or unreliable opinions from contaminating a jury trial."  *Elosu*, 26 F.4th at 1020.  At the same time, however, we have recognized that "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration."  *Id.* at 1025.  In other words, the key inquiry under Rule 702 is "whether an expert had sufficient factual grounds on which to draw conclusions," not whether the expert's "hypothesis is correct" or "corroborated by other evidence on the record."  *Id.* at 1025–26 (internal quotation marks and citation omitted).  A district court that nonetheless excludes a "relevant opinion offered with sufficient foundation by one qualified to give it," *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010), exceeds its "limited gatekeeping function" and abuses its discretion, *Elosu*, 26 F.4th at 1026.

Here, the district court erred in excluding expert reports containing relevant opinions offered with sufficient foundation to be admissible. Dr. Daniel's report, for example, opines that "Hyer was seriously mentally ill." As a psychiatrist with significant experience in forensic psychology, Dr. Daniel is well qualified to render this opinion based upon his review of the records pertaining to this case. Indeed, Dr. Daniel documents in his report the facts upon which he based his opinion. Those facts draw from years of Hyer's medical records and numerous HPD reports concerning the incident.

Neither the district court nor Defendants question Dr. Daniel's qualifications. Instead, Defendants draw attention to several assumptions listed in Dr. Daniel's recitation of factual findings that they believe are not found in or are contradicted by the record, suggesting that Dr. Daniel's expert report was properly excluded because he created his own facts. This argument fails for at least two reasons.

First, again assuming the district court excluded this report for lacking sufficient facts or data, it overlooked the data actually relied upon by Dr. Daniel in rendering his opinion. This constitutes an abuse of discretion. *See Elosu*, 26 F.4th at 1025.

Second, none of the facts contested by Defendants have anything to do with Dr. Daniel's opinion that Hyer was suffering from a mental illness. As a result, even if some of the assumptions challenged by Defendants are incorrect, they do not undermine Dr. Daniel's otherwise relevant and supported opinion regarding Hyer's mental state at the time of his encounter with the police. In short, there is no "analytical gap" to justify excluding the report. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).

For similar reasons, the district court erred in excluding DeFoe's and Dr. Sperry's reports for relying upon "false statements."   As a police practices expert, DeFoe was qualified to opine, for example, that Defendants "failed to initially determine that Mr. Steven Hyer was mentally ill, and[/]or experiencing a mental crisis" and "failed to utilize defusing techniques, effect [sic] communication and effective active listening skills."   Likewise, as a forensic pathologist, Dr. Sperry was qualified to opine whether the forensic evidence in the record corroborated Defendants' description of Hyer's posture and location in the moments immediately preceding the shooting.  Both experts specified which records and materials they reviewed in preparation for offering their opinions.  And both described the facts that they relied upon based on their review of these records and materials.

As before, neither the district court nor Defendants question DeFoe's or Dr. Sperry's qualifications.  Rather, Defendants again draw attention to several assumptions relied upon by the experts that they believe "are not supported by any evidence and are contradicted by the record." This argument is unavailing.

As   an   initial   matter,   Defendants   appear   to mischaracterize the experts' assumptions as contradicted by the record when they are either corroborated or merely disputed.  With respect to DeFoe, for example, Defendants first suggest that one of the "[f]alse statements in DeFoe's report" is his assertion that "Defendants failed to utilize defusing techniques."   But DeFoe did not state that Defendants failed to use *any* defusing techniques.  Rather, DeFoe's report suggests that Defendants failed to use the proper defusing techniques throughout the encounter, an issue that is clearly in dispute.  For instance, the officers

failed to use a throw phone and chose not to deploy the CNT. This is likewise the case with the other opinions submitted by DeFoe, including that that there was "no rush" to apprehend Hyer and that negotiations were viable but not attempted beyond announcements.

The same is true for Dr. Sperry. For example, Defendants take issue with Dr. Sperry's finding that "[a]ccording to [Corporal] Torres, he shot Mr. Hyer when Hyer had the bowstring pulled back with the arrow nocked." But this does not conflict with what Corporal Torres said in his police report, which was that he saw "the arrow being cocked and pointed in [the officers'] direction" before he shot Hyer. In fact, this understanding was confirmed by Officer Nomura, who reported that "[a]t the time the shots were fired," Hyer was "either nearly finished loading the compound bow or had completely finished loading the bow and was ready to shoot."[7]

More importantly, many of these "false statements" are simply conclusions with which Defendants disagree. Indeed, several of the statements are clearly the opinions the experts formed and that followed naturally from their uncontested expertise.

This is especially clear with respect to Dr. Sperry's report, which Defendants suggest is based on "flights of fancy and speculation" because it surmises the locations and positions of the individuals involved in the shooting when there "are no exact locations of individuals at the time of the shooting" and "there is only the trajectory for one of the

---

[7] Defendants also contend that Dr. Sperry's report suggests that Hyer himself claimed to have been in a certain position but, as Plaintiffs correctly argue, Dr. Sperry never suggested as much.

bullets in the record." However, as a forensic pathologist who studied the record evidence, including photographs of the autopsy, the autopsy report, and official investigative reports, Dr. Sperry was qualified to render an opinion on these matters. Indeed, reliance on such circumstantial evidence is common in cases involving police shootings. *See, e.g.*, *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991).

To be sure, the experts' opinions are contested, and a jury may well reject them. *See United States v. Finley*, 301 F.3d 1000, 1015–16 (9th Cir. 2002). However, while a district court may conclude that "there is simply too great an analytical gap between the data and the opinion proffered, Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1026 (internal quotation marks and citation omitted). Thus, to the extent the district court "fixat[ed] on evidence not offered in support of [the experts'] opinion[s] while simultaneously ignoring the evidence advanced on [their] behalf" and decided for itself whether the experts' conclusions were right or wrong, the court's analysis "exceeded the scope of the Rule 702 inquiry." *Id.* at 1027 (first alteration in original). Indeed, the district court and Defendants' concerns sound in weight, not foundation. Thus, the proper venue for airing out these challenges is cross-examination at trial. *See Primiano*, 598 F.3d at 564–65.

## 2.

In granting summary judgment to Defendants, the district court also determined that "the expert reports are

speculative and unreliable." *Hyer*, 654 F. Supp. 3d at 1120. The district court's ruling, however, does not support exclusion of all three reports in their entirety. First, to the extent the district court concluded that the "expert reports attempt to offer opinions based on their own speculation and assumptions about the facts rather than the actual evidence," *id.*, this argument fails for the reasons discussed above.

Second, the district court and Defendants' other arguments for finding the experts' opinions "unreliable" are unpersuasive.[8] "To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.'" *Elosu*, 26 F.4th at 1024 (quoting *Pomona I*, 750 F.3d at 1044). This assessment is flexible and can be molded to fit "the particular circumstances of the particular case." *Id.* (quoting same).

Here, the district court only provided insight into how Dr. Sperry's report "lacks reliability," concluding that it contains "conclusory opinions" and "no methodology." *Hyer*, 654 F. Supp. 3d at 1120. This conclusion is erroneous. Contrary to the district court's ruling, and as explained above, Dr. Sperry *does* provide the factual foundation for his opinions, detailing how the forensic evidence he reviewed supports his hypotheses regarding Hyer's position at the time of the shooting. His report is analogous to the extrapolations of ballistics experts (among other forensic practitioners) who, as mentioned before, commonly testify in excessive

---

[8] For their part, Defendants simply continue to list "deficiencies" in the reports. As in the previous section, these perceived deficiencies are generally either mere disagreements, mischaracterizations of the reports, or are immaterial to the experts' conclusions.

force cases. *E.g.*, *Ting*, 927 F.2d at 1510. The district court provided no reason why Dr. Sperry's methodology is deficient.

Instead, the district court merely specified that Dr. Sperry's description of the "conventional position" assumed by an individual shooting a longbow or compound bow is speculative. *Hyer*, 654 F. Supp. 3d at 1120. But, as Plaintiffs argue, such a position is "generally common knowledge," and Dr. Sperry was not required to be an archery expert to opine that the gunshot wounds are inconsistent with Hyer being in the "conventional" shooting position. Moreover, even if this portion of Dr. Sperry's opinion had been properly excluded, it would not justify excluding his remaining conclusions regarding the other inconsistencies between Defendants' eyewitness accounts and the forensic evidence from the scene because those conclusions do not require Hyer to have adopted the "conventional position." In short, the district court's reasoning does not support the wholesale exclusion of Dr. Sperry's report on the basis that it was "speculative and unreliable."

### 3.

Finally, the district court's conclusory statement that "the expert reports attempt to introduce legal conclusions that would usurp the role of the Court in instructing the jury as to the applicable law" does not support exclusion of all three reports in their entirety. *Id.* at 1120. To be sure, a district court need not permit an expert witness to testify to legal opinions. *See Reed*, 863 F.3d at 1209. Here, however, Plaintiffs' proposed experts—a forensic psychologist, a police practices expert, and a forensic pathologist—"may

provide helpful testimony . . . without veering into improper legal opinions." *Id.*

With respect to inadmissible legal opinions, the question is whether the terms used by the expert witness "have a specialized meaning in law" or "represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case . . . ." *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). If not, "the testimony is not an impermissible legal conclusion." *Id.*

In this case, each expert could provide relevant opinions and conclusions without "veering into improper legal opinions." *Reed*, 863 F.3d at 1209. For example, Dr. Daniel could provide insight into whether Hyer was experiencing mental illness at the time of the incident. *See Crawford v. City of Bakersfield*, 944 F.3d 1070, 1080 (9th Cir. 2019). Dr. Sperry could provide insight into whether the forensic evidence supports that Hyer was in a threatening posture at the time of the incident. *See Ting*, 927 F.2d at 1510. And DeFoe could help a jury understand the options available to officers in similar situations to aid them in deciding whether the defendant officers' use of force was reasonable or excessive. *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc). The district court's contrary determination was thus erroneous.

To be clear, we do not hold or imply that all three expert reports should be admitted in their entirety, or that all three experts should be free to testify on all topics or issues discussed in their reports. Indeed, we have "little doubt" that some of the experts' statements and opinions would be inadmissible. *United States v. Cohen*, 510 F.3d 1114, 1126 (9th Cir. 2007). Rather, we simply conclude that the district

court abused its discretion by excluding the expert reports in their entirety.  *See id.* (citing *Finley*, 301 F.3d at 1005).

## B. Prejudice

In addition to a showing of manifest error, "a showing of prejudice is required for reversal."  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014).  In conducting this analysis, we begin "with a presumption of prejudice."  *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005).  This presumption "can be rebutted by a showing that it is more probable than not that the [court would have reached the same result] even if the evidence had been admitted."  *Id.*  We must therefore determine whether the expert reports, if admitted, would help create genuine disputes of material fact sufficient to defeat summary judgment when viewed alongside the other evidence in the record.  *See, e.g.*, *Pyramid Techs.*, 752 F.3d at 815–17.  An expert opinion does not need to decide the matter for certain, nor "establish every element of [a] claim[,] in order for it to be admissible in evidence."  *Id.* at 816.  Finally, this determination must be made by viewing the evidence in the light most favorable to Plaintiffs (as the nonmoving parties).  *See id.*

The district court granted Defendants' motion for summary judgment on all claims, reasoning that there were no genuine disputes of material fact as to whether Defendants engaged in excessive force.  *See Hyer*, 654 F. Supp. 3d at 1137–41, 1143.  As we explain below, however, a substantive analysis of the majority of Plaintiffs' claims demonstrates that the expert reports, if admitted and when viewed alongside Plaintiffs' other evidence, would have helped raise genuine disputes of material fact sufficient to defeat summary judgment.  *See Crawford*, 944 F.3d at 1079–

81.  Thus, the district court's exclusion of the expert reports with respect to these claims was prejudicial.

### 1. Plaintiffs' Deadly Force Claim[9]

A police officer's use of excessive force on a person constitutes a seizure subject to the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  We determine whether the force used was reasonable according to an "'objective reasonableness standard,' which requires a 'careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017) (quoting *Graham*, 490 U.S. at 388, 396).  As a general matter, the strength of the government's interests is based on a number of factors, three of which are primary: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (cleaned up).  Of these, the second factor is the most important under *Graham*. *Id.*

Here, Corporal Torres used deadly force against Hyer. The "intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  For this reason, "[a]n officer's use of deadly force is reasonable

---

[9] We note that Plaintiffs also brought an excessive force claim arising out of Defendants' use of the police dog.  However, we do not reach the question of whether the exclusion of the expert reports prejudiced Plaintiffs with respect to this claim.  As we discuss later, even assuming the district court's error prejudiced Plaintiffs as to this claim, Defendants are entitled to qualified immunity given that the use of the police dog did not violate Hyer's *clearly established* rights. *See infra* pp. 39–40.

only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (internal quotation marks and citations omitted). Again, "[t]he immediacy of the threat posed by the suspect is the most important factor." *Id.*

In addition, where deadly force is used, we "must carefully examine all the evidence in the record, such as . . . contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 795 (internal quotation marks and citation omitted). This examination is especially demanding where, as here, the victim is dead and there are no other non-officer witnesses. Consequently, the principle that "summary judgment should be granted sparingly in excessive force cases . . . applies with particular force." *Id.*

We conclude that the expert reports help create genuine disputes of material fact as to whether Corporal Torres's use of deadly force against Hyer was objectively reasonable. In particular, the expert reports, when viewed in the light most favorable to Plaintiffs and alongside the other evidence in the record, could lead a reasonable factfinder to conclude that Hyer was not in a threatening position at the time he was shot, and that the government's interest in using deadly force was otherwise not sufficient to justify its use. Thus, the exclusion of the reports was prejudicial to Plaintiffs.

With respect to the severity of the crime, the district court found that "it is clear that the patrol officers at the scene had probable cause to arrest Hyer for burglary, terroristic threatening, and harassment." *Hyer*, 654 F. Supp. 3d at 1128. It then observed that because we have explained

that burglary "carr[ies] an inherent risk of violence," the severity of the crimes weighs in favor of the use of force.  *Id.*

Under this factor, however, we look not simply to the kind of offense at issue, but to the circumstances of the case to determine whether they "warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious."  *Smith*, 394 F.3d at 702. Here, even if burglary in the abstract were a crime that carries an inherent risk of violence, a trier of fact could conclude that the circumstances of this case weigh against the use of deadly force.

First, a significant period of time had elapsed between the commission or attempted commission of these crimes and the point at which deadly force was used.  In other contexts, the fact that even a violent crime, such as a physical domestic dispute, had ended by the time police became involved has counseled against the use of "intermediate let alone deadly force."  *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016).  Here, by the time the officers had arrived at the scene, Hyer had barricaded and isolated himself in his own residence.

Second, these crimes were not the reason for which the police initially sought to apprehend Hyer.  Rather, the police intended to detain Hyer to place him in protective custody for a psychiatric evaluation.  This too shows that the "'crime at issue' in this case was not 'sever[e]' by any measure." *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (alteration in original) (quoting *Graham*, 490 U.S. at 396).  In short, even if the first "primary" *Graham* factor weighs in favor of some use of force, there is a dispute of fact as to whether it counsels in favor of *deadly* force.

Likewise, a trier of fact could find that the third "primary" *Graham* factor does not weigh strongly in Defendants' favor. Although Hyer resisted apprehension, a trier of fact could also find that he did not engage in "sufficient active resistance" to warrant the use of deadly force. *Id.* at 875 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1276–77, 1282–85 (9th Cir. 2001)).

In light of the above, the second *Graham* factor appears key. In other words, "[t]he most important question . . . is whether [Corporal Torres] reasonably perceived that [Hyer] assumed a threatening or 'shooter's stance.'" *Longoria v. Pinal Cnty.*, 873 F.3d 699, 706 (9th Cir. 2017). This is because our precedent is clear that an individual's mere possession or believed possession of a weapon is insufficient to justify deadly force. *See Est. of Lopez*, 871 F.3d at 1019–20. Rather, a greater showing—for instance, that the suspect used a threatening gesture—is needed. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–79 (9th Cir. 2014).

On this question, the relevant evidence includes the eyewitness accounts of the four officers present at the time of the shooting, the forensic evidence—such as Hyer's autopsy report—and Dr. Sperry's expert opinion and report. Viewing this evidence in the light most favorable to Plaintiffs, a genuine factual dispute exists over whether Hyer posed an immediate threat to the officers. *Id.* For example, the forensic evidence, at least as interpreted by Dr. Sperry in his report, could suggest that "it is impossible for Mr. Hyer

to have been in any threatening posture with the compound bow at the moment he was shot."[10]

By contrast, two of the four eyewitness accounts—those of Corporal Torres and Officer Nomura—suggest that Hyer was loading his compound bow.  Yet Plaintiffs point to evidence in the record that, when viewed in the light most favorable to them, calls into question the credibility of Corporal Torres's and Officer Nomura's accounts regarding Hyer's location and posture.  *Cf. Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).  For example, and most blatantly, Dr. Sperry's report directly contradicts the above accounts.

Moreover, Plaintiffs point out internal inconsistencies with the defendant officers' statements and deposition testimony.  Indeed, Plaintiffs note that Corporal Torres did not mention that Hyer had loaded his compound bow in the interview immediately following the shooting, only to describe such activity in his police report hours later.  Likewise, while Officer Nomura also alleged in his report that Hyer was loading the bow at the time of the shooting, Officer Otto's and Corporal Silva's reports do not.  And while Corporal Silva (like Officer Otto) recalled being variably distracted, he both was in the immediate vicinity of

---

[10] The district court suggested that "[e]ven if the Court credited the Sperry Report, the report does not create a genuine issue of material fact" because Defendants "did not have to wait until Hyer fully loaded the arrow and pulled back the bow, or successfully shot them, before using deadly force."  *Hyer*, 654 F. Supp. 3d at 1139.  Although the court's assessment of our precedents is generally correct, the court did not consider the evidence in the light most favorable to Plaintiffs.  Indeed, because Dr. Sperry's report suggests that Hyer was not in a threatening position at all, a trier of fact could reasonably conclude that deadly force was not objectively reasonable.

Corporal Torres and Officer Nomura and stated he was "sure" he saw Hyer never "completely knock [sic] the arrow on the bow."

Faced with this conflicting evidence, a reasonable trier of fact could find that Hyer was not wielding his weapon in a threatening manner. Relatedly, a reasonable trier of fact could also find that Hyer did not pose an "immediate threat" and that the use of deadly force against Hyer was not objectively reasonable. *See Cruz*, 765 F.3d at 1078–79. Thus, summary judgment was not appropriate.

If the above were not enough, Dr. Daniel and DeFoe's expert reports further call into question whether Corporal Torres's use of deadly force was objectively reasonable in light of the governmental interests at stake. For example, the fact that Hyer was suffering from mental illness—as opined by Dr. Daniel—suggests that the governmental interest in using deadly force was diminished. *See Glenn*, 673 F.3d at 876. Relatedly, DeFoe's report could help a trier of fact infer that the defendant officers should have known about Hyer's disability and failed to act accordingly. *See Crawford*, 944 F.3d at 1080. And more broadly still, DeFoe could attest to the existence of feasible alternatives to the methods used by the police officers on the night of Hyer's shooting, another factor we have considered. *See Glenn*, 673 F.3d at 876–77; *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010).[11]

---

[11] At no point did the district court analyze these factors even though they might have "appeared in a list of nine nonexclusive factors for determining whether [Defendants'] use of force was reasonable." *Crawford*, 944 F.3d at 1079. That the expert reports could create genuine disputes of material fact on these issues counsels in favor of finding prejudice.

In sum, given that the expert reports help create genuine disputes of material fact over whether the use of deadly force against Hyer was objectively reasonable, Defendants have failed to show that "it is more probable than not" that the court would have reached the same result even if the evidence had been admitted. *Obrey*, 400 F.3d at 701. The district court's exclusion of the expert reports was therefore prejudicial with respect to Plaintiffs' deadly force claim.

## 2. Plaintiffs' Chemical Munitions Claim

The district court determined that the defendant officers' use of chemical munitions was objectively reasonable. We conclude that the expert reports help create genuine disputes of material fact as to whether the use of chemical munitions was objectively reasonable. The district court's exclusion of the expert reports was therefore prejudicial with respect to Plaintiffs' excessive force claim arising out of Defendants' use of chemical munitions.

To begin, the defendant officers' use of chemical munitions qualifies as an intermediate use of force. *See Nelson v. City of Davis*, 685 F.3d 867, 878–89 (9th Cir. 2012) (use of chemical munitions that hit plaintiff in the eye must have been "justified by substantial government interests"). Thus, Defendants must show that they possessed more than a "minimal interest in the use of force" against Hyer. *Bryan*, 630 F.3d at 831. As with the analysis regarding use of deadly force, this excessive force analysis is guided primarily by the three "primary" factors identified in *Graham*. *See Nelson*, 685 F.3d at 879.

In this case, the *Graham* analysis with respect to the first and third factors is largely the same as the deadly force analysis above. As a result, these factors do not weigh heavily in favor of the use of force, if at all. The key

questions therefore become (1) whether the intermediate use of force here—that is, the use of nine rounds of chemical munitions—is sufficiently justified by the fact that Hyer was an "immediate threat" to the defendant officers; and (2) whether any other factors justify or diminish the justification for the use of force.

On the first question, Plaintiffs have presented sufficient evidence to create genuine disputes of material fact as to whether Hyer posed an immediate threat. The district court suggested that Hyer posed an immediate threat because he had given "officers the middle finger and brandish[ed] a compound bow." *Hyer*, 654 F. Supp. 3d at 1134. But our precedent establishes that we must instead engage in a "context-specific analysis," *Glenn*, 673 F.3d at 873, examining the inherent danger of the weapon, the manner in which the suspect wielded the weapon, and the suspect's actions prior to the use of force, *see id.* (examining police officers' deadly use of force against an "emotionally disturbed" and suicidal "teenage son" and contrasting with other allowable uses of force involving threatening suspects).

Even agreeing with the district court that a compound bow and arrow constituted a "powerful" weapon, *Hyer*, 654 F. Supp. 3d at 1132, and even if Hyer had brandished the compound bow and arrow in the manner suggested by Defendants, we find it significant that he had not done so for at least three hours prior to the use of chemical munitions. Only after this period elapsed did the officers act by using the chemical munitions to "attempt to flush Hyer from the studio." *Id.* at 1134. Further, there were no bystanders at risk of harm following the defendant officers' evacuation of the house and area, and Hyer was overwhelmingly surrounded. Together, these circumstances do not

dispositively indicate that Hyer was an immediate threat to the officers, and instead raise important questions for a trier of fact to decide.

Other evidence likewise suggests that genuine disputes of material fact exist as to whether the government's interest in using intermediate force was sufficient to render it objectively reasonable. Here, the expert reports, when viewed in the light most favorable to Plaintiffs and alongside Plaintiffs' other evidence, are useful on largely the same bases as those discussed in the deadly force analysis.

First, Dr. Daniel's report concludes that Hyer was suffering from a severe mental illness on the night of the incident. Although this fact is disputed by Defendants, when viewed in the light most favorable to Plaintiffs, this evidence could lead a trier of fact to determine that the government had a diminished interest in the use of force against him. *See Glenn*, 673 F.3d at 875–76.

Second, DeFoe's report concludes that the defendant officers should have known that Hyer was experiencing a mental health crisis, and that they failed to employ a series of alternative measures that might have de-escalated the situation. Such evidence could allow a trier of fact to infer that the government's interest in using intermediate force was not sufficient to justify its use. *See Crawford*, 944 F.3d at 1080 (discussing relevance of evidence that officer should have known the decedent was suffering from mental illness); *Smith*, 394 F.3d at 703 (considering "alternative methods of capturing or subduing a suspect" in the *Graham* analysis).

Finally, there is no evidence that the officers warned Hyer prior to the use of chemical munitions. This is yet another factor which we have previously found to diminish

the reasonableness of a particular use of force.  *See, e.g.*, *Nelson*, 685 F.3d at 882.

As with the deadly force claim, Defendants offer important evidence that may lead a trier of fact to agree with Defendants' articulation of the events in question.  For example, Defendants note the important considerations that arise out of protracted standoffs with armed plaintiffs. Nonetheless, we have consistently observed that the "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281.  Rather, even when standoffs take a significant amount of time, courts must consider all the circumstances. Indeed, in *Deorle v. Rutherford*, we held that "the governmental interest in using force capable of causing serious injury was clearly not substantial" during a standoff where the officers had been at the scene "for over half an hour," the suspect had not attacked or harmed anyone, the suspect had not attempted to escape, no bystanders were near, the officers had a "clear line of escape" from their position, and where trained de-escalators were called and on their way. *Id.* at 1281–83.  In short, Defendants' evidence about the challenges associated with long standoffs, though important, is insufficient to settle the genuine disputes of material fact noted above.

In sum, Defendants have not shown that, had all evidence—including the expert reports—been properly considered and viewed in the light most favorable to Plaintiffs, a different outcome would not have resulted. Thus, the district court's evidentiary ruling excluding the expert reports was prejudicial with respect to this claim as well.

### 3. Plaintiffs' ADA Claim

Plaintiffs argued that the City and County of Honolulu violated the ADA by "fail[ing] to reasonably accommodate [Hyer's] disability in the course of investigation or arrest, causing [him] to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015). The district court determined that Plaintiffs had "failed to show that officers here discriminated against Hyer or failed to accommodate Hyer solely because of his disability." *Hyer*, 654 F. Supp. 3d at 1145. Once again, the expert reports, when viewed alongside other record evidence, raise genuine disputes of material fact as to whether the City and County of Honolulu violated Hyer's rights under the ADA.[12]

As we have previously concluded, "Title II [of the ADA] applies to arrests." *Sheehan*, 743 F.3d at 1232. "To state a claim under Title II of the ADA, a plaintiff generally must show: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and

---

[12] Plaintiffs also contend that Defendants' conduct was motivated by discrimination against individuals with disabilities. Summary judgment was appropriate as to this theory. Even assuming that such a disparate treatment claim is cognizable under the ADA, Plaintiffs have not produced sufficient evidence to create a genuine dispute of fact as to whether any of the officers were motivated by discriminatory intent. *See, e.g.*, *Anthony v. City of New York*, 339 F.3d 129, 141 (2d Cir. 2003).

(4) such exclusion, denial of benefits or discrimination was by reason of her disability." *Id.*

Here, as discussed above, Dr. Daniel's report raises genuine disputes of material fact as to whether Hyer was a qualifying individual with a disability. In addition, Plaintiffs presented evidence that HPD knew or should have known that this disability existed before any use of force was authorized, including the police reports and DeFoe's report. Thus, as in *Sheehan*, the key question is "whether the city discriminated against [Hyer] by failing to provide a reasonable accommodation during the" attempted arrest. *Id.* at 1233. On this point, DeFoe's report could certainly help a trier of fact determine whether the "officers [had] an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that [Hyer] asserts were necessary." *Id*.

In response, Defendants argue that Plaintiffs have not met their burden of producing evidence of the existence of reasonable accommodations. This is simply not true: Plaintiffs have raised a number of possible accommodations, such as the use of throw phone or the CNT. Thus, "[f]or the reasons stated here, and because the reasonableness of an accommodation is ordinarily a question of fact," *id.*, summary judgment was not appropriate on Plaintiffs' ADA claims, and the exclusion of the expert reports was prejudicial.

### 4. Plaintiffs' State Law Claims

For many of the same reasons discussed above, the expert reports are relevant and aid in establishing genuine disputes of material fact as to whether Defendants are entitled to conditional privilege under state law. In Hawaiʻi, a public official is granted a qualified or conditional

privilege from civil actions unless they acted out of malice. *Towse v. State*, 647 P.2d 696, 702 (Haw. 1982). The Hawai'i Supreme Court has further ruled that, outside defamation cases, malice is defined in its "ordinary and usual sense"— that is, "the intent, without justification or excuse, to commit a wrongful act," "reckless disregard of the law or of a person's legal rights," and "ill will; wickedness of heart." *Awakuni v. Awana*, 165 P.3d 1027, 1042 (Haw. 2007) (cleaned up). Only one of these definitions needs to be satisfied. *See id.* at 1043.

The expert reports here raise important questions of fact as to whether Defendants acted with reckless disregard of Hyer's rights. Hawaiian state courts have held that conditional privilege is not appropriate where such disputes remain in excessive force cases. *See, e.g.*, *Sanchez v. County of Kaua'i*, No. CAAP-14-0000903, 2015 WL 4546861, at \*4 (Haw. Ct. App. July 28, 2015).[13] Thus, Defendants are not entitled to conditional privilege as to their state law claims at this stage of the litigation, and the district court's wholesale exclusion of Plaintiffs' expert reports was prejudicial.

## C. Qualified Immunity

Finally, the district court also granted the defendant officers' motion for summary judgment with respect to Plaintiffs' excessive force claims. "A court's order granting qualified immunity at the summary judgment stage is improper only if the facts, viewed in the light most favorable to the plaintiff, show that a defendant's conduct violated a

---

[13] We can consider unpublished opinions in predicting how a Hawai'i state court would interpret Hawai'i law. *See Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

constitutional right *and* that right was 'clearly established' at the time of the defendant's action." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 819 (9th Cir. 2023) (emphasis added). Indeed, "[e]ven if a government official violates a constitutional right, the official is entitled to qualified immunity unless the violated right was clearly established at the time of the incident." *Andrews v. City of Henderson*, 35 F.4th 710, 718 (9th Cir. 2022). "The Supreme Court has increasingly reiterated that to meet this standard a right 'must be defined with specificity' rather than 'at a high level of generality.'" *Id.* (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)). A "case directly on point," however, is not required. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 4–5 (2021) (citation omitted). Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). That is, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 18 (2015)).[14]   Finally, "summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity

---

[14] The Supreme Court has articulated at least two other ways to demonstrate that a right was clearly established. First, in an "obvious case, [the standard in *Graham*] can 'clearly establish' the answer, even without a body of relevant case law." *Rivas-Villegas*, 595 U.S. at 4–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

until after trial on the merits." *Est. of Lopez*, 871 F.3d at 1021 (quoting *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997)).

For the reasons discussed in the previous section, we conclude that the record evidence, when viewed in the light most favorable to Plaintiffs, would permit a trier of fact to find that Defendants' use of deadly force and chemical munitions was not objectively reasonable and thus violated Hyer's constitutional rights.  The remaining question is thus whether Hyer's constitutional rights as discussed above were clearly established.  Ultimately, how the jury resolves the relevant factual disputes will determine whether the law was clearly established.  *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017).  In other words, if the trier of fact finds that Hyer posed an immediate threat to the officers, the court could then determine that the law was not clearly established.  *Id*.  But taking the facts as we must regard them at this stage of the proceedings, we conclude that, with exception of the police dog claim, the law was clearly established.  *Est. of Lopez*, 871 F.3d at 1006–07, 1021.  As to that claim, we conclude that Hyer's constitutional right to be free from excessive force was not clearly established.  We thus affirm the district court's grant of qualified immunity on that claim alone.

### 1. Plaintiffs' Deadly Force Claim

To begin, "taking the facts as we must regard them at this stage of the proceedings," we conclude that Hyer's rights were clearly established at the time of his encounter with HPD.  *Id*. at 1020.  Specifically, it was clearly established by June 22, 2018, that "the use of deadly force is unreasonable where the victim does not directly threaten the officer with" a weapon, even if the officers know the victim is armed.  *Id.*

Here, viewing the evidence in the light most favorable to Plaintiffs, Hyer was not in a threatening position at the time he was shot.  The defendant officers are thus not entitled to summary judgment on the basis of qualified immunity with respect to the use of deadly force.

## 2. Plaintiffs' Chemical Munitions Claim

We turn to Plaintiffs' claims regarding the defendant officers' use of chemical munitions.  We conclude that Hyer's right to be free from that use of force was clearly established on June 22, 2018.  In *Nelson v. City of Davis*, we held it was clearly established that "a reasonable officer would have known that firing projectiles, including pepperballs, in the direction of individuals suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance, was unreasonable."  685 F.3d at 886.  Similarly, in *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011), we held that it was clearly established that it was "unreasonable to use significant force [through the use of pepper spray] against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest . . . ." *Id.* at 1168.  At the present stage of the proceedings, we conclude that these decisions—both decided before the encounter between Hyer and HPD—were sufficient to give fair notice to Defendants that their use of chemical munitions against Hyer would violate his clearly established rights.[15]

---

[15] In addition, we note that this conclusion is bolstered by our precedents involving intermediate uses of force and individuals suffering from mental illness. *See, e.g.*, *Vos*, 892 F.3d at 1034 n.9 ("[O]ur precedent

### 3. Plaintiffs' Police Dog Claim

Finally, with respect to the defendant officers' use of the police dog, we conclude that Hyer's constitutional right to be free from such force was not clearly established at the time of his encounter with HPD, even assuming that this particular use of force was not objectively reasonable.

Our court has considered whether it was clearly established that police officers violate a suspect's Fourth Amendment rights by "using minimal force at the beginning of an encounter and escalating the level of force employed, ultimately deciding to use a police dog when other methods were unsuccessful." *Hernandez v. Town of Gilbert*, 989 F.3d 739, 745 (9th Cir. 2021). In *Hernandez*—which considered law established as of May 5, 2016—we compared the facts of the immediate case to our precedents involving police dogs, observing that the suspect in *Hernandez* had been warned several times about the police dog, was not known to be armed or unarmed, and was evading arrest for a DUI. *Id.* at 744–45. On these facts, we concluded that our precedents did "not place 'beyond debate' whether [the] use of a police dog to facilitate [the suspect's] arrest under the circumstances of this case violated the Fourth Amendment." *Id.* at 745.

Here, Plaintiffs have pointed us to no precedent published since May 5, 2016, that supports their claim, nor

---

establishes that if officers believe a suspect is mentally ill, they should . . . ma[k]e a greater effort to take control of the situation through less intrusive means." (second alteration in original) (internal quotation marks and citation omitted)). "This conclusion is [even] further buttressed by our precedent clearly establishing that a suspect's previous violent conduct does not justify non-trivial force where the suspect poses no *immediate* safety threat." *Andrews*, 35 F.4th at 719.

have they identified a general constitutional rule in our caselaw that "may apply with obvious clarity to the specific conduct in question." *Taylor*, 592 U.S. at 9 (quoting *Hope*, 536 U.S. at 741). Moreover, Plaintiffs provide no argument that this is an "obvious case." *Rivas-Villegas*, 595 U.S. at 6. We therefore conclude that the defendant officers did not have fair notice that their use of the police dog would be unconstitutional, and they are entitled to qualified immunity on this claim.

## V. Conclusion

For the foregoing reasons, we conclude that the district court abused its discretion in excluding the entirety of Plaintiffs' expert reports with respect to each of their claims, except for Plaintiffs' claim based on the defendant officers' use of the police dog and Plaintiffs' ADA disparate treatment claim. The defendant officers are not entitled to qualified immunity with respect to their use of deadly force and chemical munitions, but they are entitled to qualified immunity with respect to their use of the police dog. Summary judgment was therefore appropriate as to Plaintiffs' excessive force claim regarding the police dog and Plaintiffs' ADA disparate treatment claim. We thus reverse the district court in part, affirm the district court in part, and remand for further proceedings consistent with this opinion.

**REVERSED in part, AFFIRMED in part, and REMANDED.**

Appellants shall recover their costs on appeal.